MALL AT COVENTRY
JOINT VENTURE

v.

Andrew H. McLEOD, in his capacity as
Director of the Rhode Island Depart-
ment of Environmental Management.[1]

MALL AT COVENTRY
JOINT VENTURE

v.

Nancy MAYER in her capacity
as Treasurer of the State
of Rhode Island.[2]

No. 97–64–Appeal.

Supreme Court of Rhode Island.

Dec. 9, 1998.

---

1. This action was brought against Robert L. Ben-
dick in his capacity as Director of the Depart-
ment of Environmental Management. In accor-
dance with Rule 25(d)(1) of the Superior Court
Rules of Civil Procedure, the present incumbent
is substituted for the initial defendant.

2. This action was brought against Anthony J.
Solomon in his capacity as Treasurer of the State
of Rhode Island. In accordance with Rule
25(d)(1), the present incumbent is substituted for
the initial defendant.

James Vincent Paolino, Warwick, for Plaintiff.

Jametta O. Alston, Catherine Robinson Hall, Providence, for Defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

These consolidated cases come before the Court on the appeal of the plaintiffs, Coveco, Inc., Wasserman Realty, Inc., both Rhode Island corporations, and Cranwick Associates Limited Partnership, a Massachusetts limited partnership, collectively doing business as "The Mall at Coventry Joint Venture" (Mall Venture). Mall Venture challenges a judgment entered in the Superior Court in favor of the defendants, pursuant to the granting by the trial justice of a motion for judgment as a matter of law, in accordance with Rule 50(a) of the Superior Court Rules of Civil Procedure, and from judgments denying a complaint for mandamus and declaratory judgment. We affirm the judgments of the Superior Court. The facts and travel of these cases insofar as pertinent to this appeal are as follows.

In early 1988, Mall Venture purchased a parcel of land in the Town of Coventry for development purposes. The size of the parcel was 8.988 acres. Mall Venture desired to erect a retail facility on the tract. Since the principal officer of Mall Venture, David Wasserman, was aware that the tract contained freshwater wetlands, he engaged an engineer to identify the location of the wetlands and to file an application for preliminary determina-tion from the Department of Environmental Management (DEM) concerning the nature and extent of such wetlands. The engineer, John Caito, prepared the application for pre-liminary determination and had fourteen orange flags placed on the tract. These flags purported to mark the boundaries of the wetlands. The principal officer, David Wasserman, was the formal applicant and sought verification of the flagged wetland sites. The date of the application was August 24, 1988. It should be noted that this application for preliminary determination did not include any plan or drawing setting forth the building that was proposed to be constructed, or the location thereof.

By letter dated October 28, 1988, DEM responded that it had reviewed the application and found that the wetlands did fall under the protection of DEM and consisted of swamp. The letter further indicated that thirteen flags accurately depicted the wooded swamp edge, but that one flag, flag 9, was required to be moved ten feet in a direction of 320 degrees. The letter also indicated that DEM's approval would be required for any alteration proposed within said wetland.

During this time, Mall Venture, by its representatives, engaged in discussions with the owners of a grocery chain known as "Stop & Shop" to erect a single-story retail store on this tract. Pursuant to these negotiations, Mall Venture drew and completed site plans depicting a building of approximately 60,000 square feet in area.

On June 7, 1989, Mall Venture filed an updated preliminary determination application along with explanatory correspondence. This application informed DEM for the first time of the nature and scope of the proposed project. The covering letter described the size of the building. The letter also stated that the building would have associated amenities, and it would be served by three detention basins, which would control the storm water runoff and mitigate the environmental impact of the development. The application suggested that this proposed development would come under the insignificant alteration guidelines for construction near wetlands. In response to this letter and application, DEM replied on July 20, 1989,

stating that its staff inspection led the agency to conclude that this proposal represented a significant alteration of freshwater wetlands and that, therefore, a formal application would be required.

Mall Venture's engineer then requested a meeting with representatives of DEM to discuss alternatives in an attempt to avoid the lengthy formal application review process. Following this request, a meeting was held on August 28, 1989. In attendance were Mall Venture representatives, John Caito, George Gifford, and Bernard Wasserman; and DEM representatives, principal environmental scientist Brian Tefft and biologist Susan Cabeceiras, who initially had examined the flagged wetland location. At this meeting, Mall Venture representatives sought to persuade DEM to treat the proposed project as an insignificant rather than a significant alteration of freshwater wetlands. However, Tefft, a DEM supervisor, disclosed that he had reexamined the parcel of land four days prior to the meeting and had determined that there was a contiguous unflagged wetland. This wetland was later referred to in the litigation as "the bowling pin." Tefft testified before the Superior Court that if the bowling pin was not a contiguous wetland, it would not have come within DEM's jurisdiction because of its small size. It was later disclosed to the Superior Court that Mall Venture representatives George Gifford, an environmental planner, and engineer John Caito, had become aware of the bowling pin in 1988, but did not consider it to meet the jurisdictional requirements in respect to size.

On September 20, 1989, Mall Venture submitted a formal application to alter a wetland, together with a covering letter, the required fee, and various plans. The covering letter described a 60,000+ square foot retail building with associated amenities and stated that the utilities serving the site would tie into existing utilities on Tiogue Avenue. It further pointed out that three detention basins would control the storm-water runoff and mitigate the effect of the development on the environment. The letter also proposed that dense plantings would be installed in the buffer area adjacent to the swamp and further stated that there would be no proposed encroachment within the wetland proper. Supervisor Tefft testified before the Superior Court that the site plan submitted with the formal application was exactly the same as that earlier submitted in its request for preliminary determination. This site plan did not indicate the location of the bowling pin, nor did it contain alterations that had been required in DEM's July 20, 1989 letter, unrelated to the bowling pin.

In response to the formal application DEM pointed out that this application failed to include the bowling pin, which had earlier been determined to form an integral part of the swamp. DEM reiterated that corrections in the wetland edge had not been included. In conclusion, DEM required that the corrections in the application and site plan be made as a condition precedent to the processing of the application.

On December 22, 1989, Mall Venture by its attorney notified DEM that it was bound by its preliminary determination, which indicated that the wetland had been delineated appropriately with one exception with respect to the flag number 9. In essence, Mall Venture declined to make the corrections mandated by DEM and suggested that unless DEM proceeded in accordance with its preliminary determination, court action would result.

At some point during the interval following the first formal application, Mall Venture terminated its tentative agreement with Stop & Shop. The grocery chain chose an alternate site owned by an entity other than Mall Venture. The loss of this opportunity later formed a basis for the damage claim brought against the General Treasurer.

On January 12, 1990, Mall Venture brought an action against DEM seeking declaratory relief and a writ of mandamus. The petition for declaratory relief sought a declaration that DEM should proceed according to its preliminary determination set forth in its letter of October 28, 1988. DEM answered the complaint by asserting a number of affirmative defenses including the failure to state a claim upon which relief could be granted, estoppel, waiver, and unclean hands. It should be noted that DEM did not raise

the issue of failure to exhaust administrative remedies.

Two years later, on June 22, 1992, Mall Venture moved to amend its complaint to add money damages and to demand a jury trial. This motion was denied. Thereafter, Mall Venture filed a separate action against the General Treasurer seeking money damages arising out of DEM's negligence in not identifying and flagging the wetland properly. Mall Venture further alleged that DEM's negligence had caused Mall Venture to incur substantial costs in engineering, surveying, and legal fees based on the original letter of October 28, 1988. In count 2 of the damage action, Mall Venture sought damages for lost opportunities, costs, and profits in an amount in excess of $500,000.

### The Damage Claim

On August 31, 1993, Mall Venture filed a motion to consolidate both actions. This motion was granted on October 22, 1993. The consolidated cases were tried before a justice of the Superior Court and a jury beginning March 2, 1995. The plaintiff requested that the issue of damages be presented to the jury and that the trial justice determine the issues raised in the declaratory judgment action. After Mall Venture rested, defendants moved for judgment as a matter of law in both cases. After hearing arguments, the trial justice denied both motions and defendants presented their evidence. After the close of all evidence, defendants renewed their motion for judgment as a matter of law pursuant to Rule 50(b). The trial justice reserved decision on the motion and submitted the damage issue to the jury. The jury returned a verdict in favor of Mall Venture in the amount of $ 1,696,000.

After receiving the verdict, the trial justice heard further arguments on motions for new trial or remittitur (limiting damages to $100,-000) and on the motion for judgment as a matter of law. The trial justice rendered his decision on the motion for judgment as a matter of law and having granted said motion, determined that he would not reach the issues in respect to the motion for new trial or remittitur.

■ The trial justice applied the appropriate standard in passing upon said motion. He reviewed the evidence in the light most favorable to the plaintiff, without weighing the evidence or considering the credibility of the witnesses, and extracted from the evidence only those reasonable inferences that supported the plaintiff's position. *Rickey v. Boden*, 421 A.2d 539, 542–43 (R.I.1980). He then determined that after having so reviewed the evidence, no reasonable conclusion in favor of plaintiff could be reached. *Adler v. Lincoln Housing Authority*, 544 A.2d 576, 579 (R.I.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 496, 102 L.Ed.2d 532 (1988). He determined, based on the evidence before the court, that plaintiff had failed to establish reasonable reliance on the preliminary determination of DEM and that even excluding the bowling pin, Mall Venture failed to make the changes required by DEM in its response to the second preliminary determination application and failed to complete its formal application.

The trial justice also suggested that Mall Venture had failed to exhaust its administrative remedies under the doctrines set forth in *Greenwich Bay Yacht Basin Associates v. Brown*, 537 A.2d 988, 992–93 (R.I.1988), but since defendants had been silent on this potentially dispositive issue, the trial justice felt constrained to address the merits of plaintiff's claim. Essentially the trial justice determined as a matter of law that DEM had no duty in its initial preliminary determination to ascertain the accuracy of plaintiff's identification of the wetland. He also pointed out that DEM's failure initially to determine that the unflagged bowling pin was a wetland did not create an equitable estoppel.

■ Applying the same standards as those applied by the trial justice, as we are required to do, we are of the opinion that he was correct in determining that DEM had not violated any duty to Mall Venture. Essentially DEM was acting in a quasi-judicial capacity in administering the Fresh Water Wetland Act, G.L.1956 § 2–1–18 to § 2–1–24. The duty to depict accurately the location of wetlands was properly the duty of Mall Venture and its representatives. In determining the existence or nonexistence of an equitable

estoppel, it is necessary to balance the private interest against the public welfare. We have recognized the doctrine of equitable estoppel in instances where justice and right so required and in limited and extraordinary circumstances. *State v. DeWitt*, 557 A.2d 845, 849 (R.I.1989); *Ferrelli v. Department of Employment Security*, 106 R.I. 588, 591–94, 261 A.2d 906, 909-10 (1970); *Shalvey v. Zoning Board of Review of Warwick*, 99 R.I. 692, 695–700, 210 A.2d 589, 591–93 (1965). In *Shalvey*, we held that when a building permit was issued lawfully for a permitted use, a subsequent amendment to the zoning ordinance could not diminish the landowner's right to proceed if the landowner had acted in reliance thereon in good faith. 99 R.I. at 699, 210 A.2d at 593–94.

There is no question that DEM was acting in a governmental capacity in passing upon Mall Venture's application to alter a wetland. This is an act that could not be performed by a private person. *See Ryan v. State Department of Transportation*, 420 A.2d 841 (R.I. 1980). Although the trial justice did not rely on the doctrine of quasi-judicial immunity in granting the judgment as a matter of law, we are of the opinion that this doctrine would have been an appropriate rationale for his decision. We often have stated that this Court may affirm a justice of the Superior Court on grounds other than those which he or she has utilized in determining the outcome of the case. *See, e.g., O'Connell v. Bruce*, 710 A.2d 674, 675 n. 2 (R.I.1998); *State v. Nordstrom*, 529 A.2d 107, 111–12 (R.I.1987); *Warren Education Association v. Lapan*, 103 R.I. 163, 171, 235 A.2d 866, 871 (1967). In a recent case, *Psilopoulos v. State*, 636 A.2d 727 (R.I.1994), we held that agents of the state who performed a quasi-judicial function were entitled to immunity both for themselves and for the sovereign entity that employed them. *Id.* at 727–28 (citing *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Ryan v. State Department of Transportation*, 420 A.2d 841 (R.I.1980); *Calhoun v. City of Providence*, 120 R.I. 619, 390 A.2d 350 (1978)). In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court dealt with an action brought against the Secretary of Agriculture, officers of that

agency, and administrative judicial hearing officers. The Court stated that the nature of the function performed by administrative law judges, as well as those members of the agency who fulfilled prosecution functions, should be given absolute immunity for the same reasons that such immunity is given to members of the judiciary and to federal prosecutors. *Id.* at 508–16, 98 S.Ct. at 2912–15, 57 L.Ed.2d at 917–22. The Court stated that the role of the modern federal hearing examiner or administrative law judge was functionally comparable to that of a trial judge. *Id.* at 513, 98 S.Ct. at 2914, 57 L.Ed.2d at 920. The Court held that the public interest demanded that these officials be allowed to render decisions free from fear that they might face an action for damages from litigants who might be dissatisfied with the agency's action in either initiating or deciding a proceeding. *Id.* at 516, 98 S.Ct. at 2915, 57 L.Ed.2d at 922. The Court observed: " 'When millions may turn on regulatory decisions there is a strong incentive to counterattack.' " *Id.* at 515, 98 S.Ct. at 2915, 57 L.Ed.2d at 927 (quoting *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution*, 566 F.2d 289, 293 (D.C.Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160–61 (1978)).

In the case at bar, a counterattack that resulted in a verdict of $ 1,696,000 is illustrative of the exposure of quasi-judicial and/or quasi-prosecutorial agency members when their decisions, or lack thereof, may impinge upon the aspirations of developers. In *Butz*, the Court also emphasized that the constitutional rights of those who might be involved in litigation with the Department of Agriculture would have the safeguard of judicial review. 438 U.S. at 516, 98 S.Ct. at 2915, 57 L.Ed.2d at 922. Certainly, the same safeguard is available in respect to any decision issued by DEM or any other administrative agency that is subject to the Administrative Procedures Act and whose decisions, as in the present case, are appealable to the Superior Court.

We pointed out in the case of *Calhoun v. City of Providence*, 120 R.I. 619, 390 A.2d 350 (1978), that the waiver of sovereign immunity in G.L.1956 § 9–31–1 did not repeal

or supersede the immunity granted to judicial decision-makers as set forth in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), or to prosecutors as recognized in *Suitor v. Nugent*, 98 R.I. 56, 199 A.2d 722 (1964). *Calhoun*, 120 R.I. at 631, 390 A.2d at 356; *see also Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

The doctrine of quasi-judicial immunity is closely associated with the doctrine of exhaustion of administrative remedies. In *Greenwich Bay Yacht Basin Associates*, we recognized that even if the doctrine of estoppel might be raised in respect to actions taken by the Coastal Resources Management Council, it was appropriate that the parties seek an administrative declaration of the standards to be utilized and further pointed out that any such declaration by the agency would be reviewed by the Superior Court. 537 A.2d at 993. In so doing, we indicated our strong preference for proceeding with an administrative procedure through judicial review as opposed to instituting a separate action as was sought to be done in that case. *See id.* This court again wishes to emphasize that it sternly opposes the bringing of separate actions against agency officials in respect to their performance of quasi-judicial or quasi-prosecutorial functions.

In *Conklin Limestone Co. v. State Department of Environmental Management*, 489 A.2d 327 (R.I.1985), we were confronted by a controversy relating to an alteration of a wetland in the Town of Lincoln. Conklin operated a limestone quarry in an area crossed by the Moshassuck River. *Id.* at 328. DEM had issued a cease and desist order against Conklin from diverting the river and discharging sediment into wetlands. *Id.* Rather than seeking a permit from DEM, Conklin brought an action in the Superior Court seeking injunctive relief. A justice of the Superior Court concluded that the Wetland Act did not apply and awarded a permanent injunction against DEM and also declined to enforce the cease and desist order previously issued by DEM. *Id.* at 328–29. In our analysis we pointed out that Conklin had not exhausted its administrative remedies and made the following comment:

"Conklin did not request a hearing and sought judicial relief instead. Pursuant to the Administrative Procedures Act, judicial review is accorded any person who has exhausted all administrative remedies available to him/her within an agency and is aggrieved by a final decision in a contested case. General Laws 1956 (1984 Reenactment) § 42–35–15(a). This court has stated that the legislative intent in enacting § 42–35–15(a) was to provide a single and exclusive method of obtaining judicial review of agency decisions; that is, only after exhaustion of administrative remedies. *New England Telephone & Telegraph Co. v. Fascio*, 105 R.I. 711, 715, 254 A.2d 758, 761 (1969). Conklin defends that it could not comply technically with the DEM requirements for making application for a permit to alter wetlands since it was impossible to show the requested 'plan' of where the vein of limestone would be in the next three or five years. Such impossibility, Conklin asserts, amounted to being equivalent to an exhaustion of Conklin's administrative remedies. This argument is legally untenable. Applying for a permit prior to seeking judicial relief is the exclusive remedial method specified under the act. Proper procedure is to apply for a permit, and if denied, an appeal to the Superior Court, in accordance with § 2–1–21 and the Administrative Procedures Act made applicable by § 2–1–20.1, is in order. We conclude that the state's position on this issue is correct and that the trial justice clearly erred by failing to dismiss Conklin's complaint for failure to exhaust administrative remedies." *Conklin Limestone Co.*, 489 A.2d at 329–30.

We recognize that in the case at bar, the trial justice would have preferred to dismiss the actions brought by Mall Venture on the ground that it failed to exhaust its administrative remedies. Nevertheless, he was constrained by the state's failure to raise this defense in addressing the merits of Mall Venture's complaint. We agree that his granting a motion for judgment as a matter of law was appropriate under the circumstances. His holding that DEM had no duty in its preliminary determination to make a finding in regard to the bowling pin was

correct. Mall Venture's duty was accurately to set forth the wetlands included on the parcel that it sought to develop.

It was certainly not the duty of DEM to make a final response in an application for preliminary determination. DEM had every right to investigate more thoroughly and did so through its supervisor, Brian Tefft. Indeed, its first official response to the request for preliminary determination was to indicate clearly and unequivocally in its letter dated July 20, 1989, that the proposal involved a significant alteration of freshwater wetlands and that therefore, a formal application would be required. Its letter of October 28, 1988, concerning the location of the swamp edge, did nothing to create an equitable estoppel against its further investigation of Mall Venture's proposal. It is, of course, significant that it was not until the updated preliminary determination application of June 7, 1989, that Mall Venture even indicated to DEM the nature and scope of the proposed building to be erected.

We go beyond the decision of the trial justice to grant the motion as a matter of law. We do this to indicate that only in the most egregious circumstances, not present in this case, would an applicant for alteration of a wetland ever be justified in bringing an action against DEM before having filed a formal application, having had that application denied, and further having availed itself of judicial review, as provided in G.L.1956 § 42–35–15(a) and further referenced in G.L. 1956 § 2–1–21 of the Wetlands Act as well as § 2–1–20.1 which makes the Administrative Procedures Act applicable to a Wetlands appeal.

As we indicated in *Conklin Limestone Co.*, it was the legislative intent to provide a single and exclusive method of providing judicial review of agency decisions after exhaustion of administrative remedies. 489 A.2d at 329. Since this method of enforcement of the Wetlands Act with judicial review, as provided by the Administrative Procedures Act, creates a single and unitary method of enforcement of the Wetlands Act, an applicant for alteration of wetlands is not free to choose to ignore this proceeding and seek judicial relief by a separate action either for injunctive relief or for damages. If an applicant pursues this route, then the applicant will be faced with the doctrine of quasi-judicial administrative immunity that will serve as a bar to seeking relief outside the method provided by the Legislature.

In so holding, we do not suggest that an applicant may not have an action for inverse condemnation in the event that an administrative agency deprives such applicant of all beneficial use of the subject property by denying an application for development, as we recognized in *Woodland Manor III Associates v. Keeney*, 713 A.2d 806 (R.I.1998). In that case, we recognized that an action for taking of property either temporary or permanent, might be brought in circumstances wherein there had been a temporary deprivation of the utilization of a portion of property sought to be developed by Woodland Manor III Associates. *Id.* at 810–13. In so doing, we were enforcing the Takings Clause of the Fifth Amendment to the United States Constitution as well as article 1, section 16, of the Rhode Island Constitution, our own constitutional prohibition against the taking of private property without compensation. *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 2893–94, 120 L.Ed.2d 798, 812–13 (1992); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318, 107 S.Ct. 2378, 2387–88, 96 L.Ed.2d 250, 265–66 (1987); *Annicelli v. Town of South Kingstown*, 463 A.2d 133 (R.I.1983). Such a claim also could be raised on appeal from denial of an application. *J.M. Mills, Inc. v. Murphy*, 116 R.I. 54, 70, 352 A.2d 661, 669 (1976).

In the present action, a claim for inverse condemnation was set forth in the complaint, but *no evidence was presented in support of* that allegation. Consequently, the trial justice granted a motion for entry of judgment as a matter of law in respect to that claim.

In respect to its claim of damages based upon negligence and estoppel, Mall Venture did not establish the necessary factual predicate. Here Mall Venture decided to shortcut the administrative process by insisting that a preliminary determination, without even the benefit of a site plan, would be binding upon

DEM. This unilateral determination by the applicant did not justify the bringing of a separate action for damages and was properly denied as a matter of law by the trial justice.

### Mandamus

■ The trial justice properly denied and dismissed Mall Venture's petition for mandamus and correctly cited *Gormally v. Cannon*, 119 R.I. 771, 776, 383 A.2d 582, 585 (1978), as holding that a judgment for mandamus would issue only when the petitioners have a clear legal right to have an action done, and when the respondents have a ministerial duty to perform such an act without discretion to refuse.

In the case at bar, DEM had no clear ministerial duty to grant the application of Mall Venture on the basis of a mere preliminary determination relating to the flagging of wetlands. Obviously, DEM had the right and the duty to exercise its discretion in passing upon a formal application for a significant alteration of a wetland.

Consequently, the action for mandamus was appropriately denied and dismissed.

### Declaratory Judgment

■ The trial justice dismissed the action for declaratory judgment on the ground that there was no actual dispute or controversy concerning the verification of the flagged wetland on the subject parcel, as set forth in its letter of October 28, 1988. In essence, the court held that it declined to limit the jurisdiction of DEM to the wetland described in its October 1988 letter. For the reasons that have been outlined in respect to the damage claim, we affirm the denial of the petition for declaratory judgment.

For the reasons stated, the appeal of the plaintiffs is denied and dismissed. The judgments entered in the Superior Court are hereby affirmed. The papers in the case may be remanded to the Superior Court.